# In the United States Court of Federal Claims

Nos. 14-167C & 14-168C

(E-Filed: July 3, 2019)[1]

|  |  |
|---|---|
| GEORGIA POWER COMPANY and ALABAMA POWER COMPANY, <br><br>  Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br>  Defendant. | ) <br> ) <br> ) Summary Judgment; RCFC 56; Partial <br> ) Breach of Contract; Spent Nuclear Fuel; <br> ) Rate of Return Offset; Cask Loading <br> ) Costs; Construction Claim; Damages; <br> ) Collateral Estoppel. <br> ) <br> ) |

Alan T. Rogers, Birmingham, AL, for plaintiffs.  Adam K. Israel, of counsel.

Melissa L. Baker, Trial Attorney, with whom appeared Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Lisa L. Donahue, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Jane K. Taylor, United States Department of Energy, of counsel.

OPINION & ORDER

CAMPBELL-SMITH, Judge.

Plaintiffs Georgia Power Company and Alabama Power Company filed complaints on March 4, 2014, alleging that defendant partially breached its contractual obligations related to the removal of spent nuclear fuel from plaintiffs' facilities.  See Georgia Power Co. v. United States, Case No. 14-167C, ECF No. 1 (complaint); Alabama Power Co. v. United States, Case No. 14-168C, ECF No. 1 (complaint).  The two cases have been consolidated for the purposes of discovery and trial.[2]  See ECF No.

---

[1] This opinion was issued under seal on June 12, 2019.  The parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  No redactions were proposed by the parties.  Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

[2] Georgia Power Co. v. United States, Case No. 14-167C, has been designated as

23 (order).   Presently before the court are plaintiffs' motion for partial summary judgment addressing the issues related to plaintiffs' rate of return and sally port construction, ECF No. 77, and defendant's cross-motion for partial summary judgment on plaintiffs' rate of return, and opposition to plaintiffs' motion for recovery of sally port construction costs, ECF No. 79.   In ruling on these motions, the court has considered: (1) plaintiffs' motion for partial summary judgment, ECF No. 77; (2) defendant's cross-motion and response in opposition to the motion, ECF No. 79; (3) plaintiffs' reply in support of their motion and response to defendant's cross-motion, ECF No. 83; and (4) defendant's reply in support of its cross-motion, ECF No. 86.

For the following reasons, both plaintiffs' motion for partial summary judgment, and defendant's cross-motion for partial summary judgment are hereby **DENIED**.

I.   Background

This is the third round of litigation related to defendant's continuing breach of the same agreements it entered into with plaintiffs.   See S. Nuclear Operating Co., et al. v. United States, Case No. 98-614C (filed July 29, 1998); Alabama Power Co., et al. v. United States, Case No. 08-237C (filed April 3, 2008).   Defendant entered into nearly identical Standard Contracts with each of the utilities in this case, under which defendant, through the Department of Energy (DOE), agreed to dispose of the utilities' spent nuclear fuel at Plant Vogtle Units 1 & 2 (Vogtle), the Joseph M. Farley Nuclear Plant (Farley), and the Edwin I. Hatch Nuclear Plant (Hatch).[3]   Defendant's liability for partial breach of the Standard Contract has long since been established.[4]

---

the lead case.   As such, all electronic case filings referenced in this opinion appear on the Georgia Power docket unless otherwise stated.

[3]   In S. Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 (2007), aff'd in part, vacated in part, 637 F.3d 1297 (Fed. Cir. 2011), the court wrote extensively on the contracts between the utilities and the government, and on the historical context that led to their formation.   In the interest of focusing on the new issues before the court, the earlier discussion is not repeated in this opinion.

[4]   See S. Nuclear, 77 Fed. Cl. at 459 (holding that "the government had partially breached the Standard Contract by failing to begin accepting [spent nuclear fuel] in January 1998," and stating that "[t]here is no issue on appeal as to liability; liability in these [spent nuclear fuel] cases has been established"); see also Alabama Power Co. v. United States, 119 Fed. Cl. 615, 618 (2014).

2

In their motion for partial summary judgment, plaintiffs seek a ruling that: "(1) the United States . . . should be denied any damages offset because of Plaintiffs' rate of return and (2) that Georgia Power is entitled to recover damages related to the construction of the Plant Vogtle (Units 1 & 2) sally port." ECF No. 77-1 at 1. In its cross-motion, defendant argues that "summary judgment should be granted in the Government's favor regarding the offset the Government seeks to account for plaintiffs' rate of return directly attributable to spent fuel assets." ECF No. 79 at 7-8. Defendant opposes plaintiffs' motion for partial summary judgment as to the sally port construction costs, but does not cross-move for judgment on that issue. See id.

II.   Legal Standards

According to the Rules of the United States Court of Federal Claims (RCFC), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

A genuine dispute of material fact is one that could "affect the outcome" of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power, 16 F.3d at 1202 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. Celotex, 477 U.S. at 324.

The Supreme Court of the United States has instructed that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for [the fact-finder] to return a verdict for that party." Id. at 249 (citation omitted). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power, 16 F.3d at 1202 (citing Celotex, 477 U.S. at 323).

III. Analysis

    A. Neither Plaintiffs nor Defendant Is Entitled to Summary Judgment with Regard to Offsets for Plaintiff's Rate of Return

In their motion for partial summary judgment, plaintiffs argue that defendant "cannot offset the Plaintiffs' damages by their rate of return." ECF No. 77-1 at 15. Plaintiffs characterize the "rate of return" as part of the cost of capital borne by plaintiffs, and ultimately their customers, as a result of defendant's failure to dispose of the spent nuclear fuel as provided in the Standard Contracts. See id. at 8-11 (detailing the rate-making process and how cost of capital is accounted for by regulatory authorities in Alabama and Georgia); see also id. at 20 (explaining that "Plaintiffs' allowed return on equity is in reality a financing cost incurred to access equity capital, much like debt costs, required to undertake the capital projects necessitated by the Government's breach"). Plaintiffs allege that binding precedent bars their recovery of financing costs, and as such, allowing defendant an offset for an unrecoverable cost would "inflict a double dip damage to Plaintiffs' customers." Id. at 19.

Plaintiffs also claim that the rate of return is unrecoverable because it is unrelated to the damages at issue here. According to plaintiffs:

> [t]he rate of return on common equity adopted by Plaintiffs' respective public service commissions in determining a fair return on investment in setting just and reasonable rates has no relation to whether the Plaintiffs incurred the costs they claim as damages in this case as a result of the Government's breach of the Standard Contract.

Id. at 15. Because plaintiffs' "financial performance . . . is wholly unrelated to the Government's breach of the Standard Contract," plaintiffs insist that defendant cannot establish the right to an offset for plaintiffs' rate of return. Id. at 15-16 (noting that "[p]laintiffs' return is affected by a multitude of factors, such as extreme weather, customer growth or decline, increased economic development . . . , efficiencies, unusual O&M costs, variable outage costs, and many other factors too numerous to even try to enumerate").

Defendant's position on the rate of return is diametrically opposed to plaintiffs. In its cross-motion for partial summary judgment, defendant characterizes plaintiffs' return as a "profit" rather than a cost, and argues that it "must be accounted for in determining the net difference between costs plaintiffs incurred in the actual world, versus the 'but-for' world of DOE performance." ECF No. 79 at 7. Defendant argues

that it is entitled to an offset for plaintiffs' rate of return based on the following facts, allegedly established through discovery:

> (1) spent-fuel related assets that only exist as a result of DOE's partial breach of the Standard Contract—and that plaintiffs therefore seek to recover the costs of in this litigation—were included in plaintiffs' profit-generating rate bases; (2) [p]laintiffs earned a return on those assets in their respective rate bases—including a return on equity—that plaintiffs have identified as directly attributable to those assets; and (3) that return on equity represents a portion of the companies' profit that was paid out to shareholders.

Id. at 9.   Based on these facts, defendant concludes that "there is no genuine question of fact as to either the existence, or the amount, of plaintiffs' incremental benefit as a direct result of the Government's partial-breach."   Id.   Put another way, defendant asserts that its "partial breach has conferred a financial benefit upon plaintiffs through the additional return, or profit, that plaintiffs have obtained from their ratepayers on certain breach-related assets, which must be credited against their respective claims for damages."   Id. at 23.

Defendant acknowledges that the formula used to calculate plaintiffs' rates "includes both the cost of debt financing and the allowable return to company shareholders, the company's profit—and thus, the basis for the Government's claimed offset—consists . . . only of the latter."   Id. at 14 n.3.   In their reply, plaintiffs take issue with defendant's attempt to "distinguish between the costs Plaintiffs must pay in order to access debt financing and equity financing," ECF No. 83 at 14, and accuse defendant of having "a complete lack of understanding of Plaintiffs' utility business," id. at 15.   According to plaintiffs, a review of the "regulatory construct" within which the utilities operate "reveals the illogical underpinning of the Government's argument."   Id. at 16.   And finally, plaintiffs argue that even if defendant's theory of recovery was sound, plaintiffs did not in fact receive any increased equity during the damages period at issue in this round of litigation that could be offset in the damages calculation.   See id. at 17-18.

Both parties argue extensively about the application of various precedents to this case.   The arguments, however, are difficult to evaluate because the parties are not working with a clear and agreed upon set of facts.   The parties are fundamentally at odds with regard to the nature of the damages claimed by plaintiffs—whether they are costs or profits—and the viability of any attempt to separate the requested offset from other elements of plaintiffs' rate base.   The current posture of this case precludes the court from resolving disputes between the parties relating to facts that are so central and material to the resolution of the issues at hand.   Accordingly, the court finds that

5

summary judgment on the rate of return issue is inappropriate—in favor of either party—at this stage of the litigation.

> B. Plaintiffs Are Not Entitled to Summary Judgment with Regard to Sally Port Construction Costs

Plaintiffs also seek partial summary judgment in favor of Georgia Power for recovery of the costs related to sally port construction at Plant Vogtle. See ECF No. 77-1 at 21. Plaintiffs' argument is founded on the doctrine of collateral estoppel, see id. at 21, and the fact that the court awarded construction costs for the same sally port to Georgia Power in the last round of this litigation, see id. at 22 (citing Alabama Power Co. v. United States, 119 Fed. Cl. 615, 618 (2014)). Defendant does not dispute that the court has previously awarded sally port construction costs to Georgia Power, but opposes the application of collateral estoppel to the issue in this iteration of the case. See ECF No. 79 at 32.

According to plaintiffs, "[t]he Government is collaterally estopped from relitigating the recoverability of Georgia Power's damages for constructing the new sally port at Plant Vogtle." ECF No. 77-1 at 21. The doctrine of collateral estoppel "protects the finality of judgments by 'preclud[ing] relitigation in a second suit of claims actually litigated and determined in the first suit.'" Laguna Hermosa Corp. v. United States, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (quoting In re Freeman, 30 F.3d 1459, 1465 (Fed. Cir. 1994)). Collateral estoppel applies to bar a successive claim when: "(1) the issue is identical to the one decided in the first action; (2) the issue was actually litigated in the first action; (3) the resolution of the issue was essential to a final judgment in the first action; and (4) the plaintiff had a full and fair opportunity to litigate the issue in the first action." See id. Plaintiffs argue that each of these elements is met, see ECF No. 77-1 at 21-24, while defendant claims that none of the elements are met, see ECF No. 79 at 33-39.

Defendant's argument is based on the proposition that "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." Montana v. United States, 440 U.S. 147, 159 (1979). In making its previous award of damages related to sally port construction, the court cited the following evidence presented by plaintiffs at trial:

> Georgia Power built the new sally port because the existing port led to a road that could not bear the combined weight of the loaded Holtec casks and the transportation vehicles, some 600,000 pounds. The opening of the sally port was also too narrow for the large transportation vehicles required to move the loaded casks to the ISFSI. In the non-breach world, however, Georgia

> Power claims that it would not have needed the new sally port because the government would have brought smaller casks, in accord with its contractual obligation to provide casks "suitable for use at the Purchaser's site." In addition to the sally port limitations, Georgia Power argues that the government would have provided small casks to Plant Vogtle because there was no functional rail spur at the site, therefore requiring the government to remove the SNF in smaller, lighter casks by truck. Georgia Power insists that the original sally port could have accommodated any cask that was appropriate for such over-the-road transport.

Alabama Power, 119 Fed. Cl. at 632-33 (citations omitted). The court concluded, as follows:

> [I]t seems very likely to the court that, as the government argues, Georgia Power would have made plant modifications to accommodate larger casks. The efficiencies of time and money, along with the reduction in risk to workers, are considerable. On this basis, the government asks the court to find that in the "non-breach world," Georgia Power would have installed a new sally port, and thus, disallow recovery of construction costs. The problem with this argument is that these very reasonable, and even likely, steps are not required by the contract, and it is merely speculation that Georgia Power would have taken them. Therefore, insofar as the non-breach world is one in which the parties abide by their contractual obligations, the court finds that Georgia Power would not have been required to install a new sally port. The government is, in fact, required under the contract to deliver casks that are "suitable for use at the Purchaser's site." And casks requiring expensive building modifications are, by definition, not "suitable for use at the Purchaser's site."

Id. at 633 (citation omitted). For these reasons, the court held that the costs for the new sally port were compensable. See id. at 633-34.

In this round of litigation, defendant argues that plaintiffs attempt to change the facts that supported the trial court's previous ruling. Specifically, defendant states that the court's decision to award sally port construction costs was predicated on plaintiffs' position that "DOE would have supplied smaller truck casks" had it performed as originally intended under the contract, but that plaintiffs now argue "they would have requested that DOE provide larger, rail, casks during the claim period applicable to this round of litigation." ECF No. 79 at 35. Defendant bases this argument on: (1) plaintiffs' response to a request for admission in which plaintiffs stated that "had DOE begun performing under the Standard Contract in January 1998, [Georgia Power] would

7

have requested that DOE utilize a rail cask for acceptance of spent nuclear fuel from Plant Vogtle Units 1 & 2," and (2) plaintiffs' expert's statement that she was told to "'assume that the crane would have been repaired . . . such that . . . . up to [a] 125 ton package could have been handled' at Plant Vogtle." Id. at 19 (emphasis added by defendant). Defendant contends that the "unrebutted evidentiary record shows that plaintiffs would have built a second sally port in this claim period to accommodate DOE-supplied rail casks weighing 125-tons." Id. According to defendant, plaintiffs' new position as to the relevant cask size constitutes a material change in the facts essential to the judgment, and consequently, requires a new analysis of whether the second sally port would have been required to accommodate the larger rail casks defendant now claims plaintiffs would have requested.

Plaintiffs deny any change in position, stating that "Georgia Power has consistently argued that it would request a cask that is able to be transported over the road legally." ECF No. 83 at 20. Plaintiffs also disagree that the evidence on which the court based its previous award of sally port construction costs establishes that plaintiffs would have insisted on the use of small truck casks. See id. at 20-23. In making this argument, plaintiffs cite to their expert's testimony in this case regarding the vehicles DOE likely would have used if it had performed under the contract, and cite to the Georgia Department of Public Safety website to support its position that heavy haul vehicles are permitted on public roadways. See id. at 23-24.

The parties are clearly at odds as to whether the evidence considered and relied upon by the court in the last round of litigation differs from the facts now alleged by plaintiffs in support of their claim to recover additional sally port construction costs. In order to determine whether defendant is collaterally estopped from challenging the recovery of such costs in the present case, the court would need to resolve a genuine dispute as to facts that could "affect the outcome" of this matter. Anderson, 477 U.S. at 248. The court cannot make such a determination in the context of a motion for summary judgment. Accordingly, plaintiffs are not entitled to summary judgment on their request to recover sally port construction costs.

IV.   Conclusion

For the foregoing reasons, plaintiffs' motion for partial summary judgment, ECF No. 77, is **DENIED**; and defendant's cross-motion for partial summary judgment, ECF No. 79, is also **DENIED**. The parties are directed to **FILE** a **joint status report**, on or before **July 12, 2019**, proposing a schedule for further proceedings in this matter.

8

On or before **June 26, 2019**, the parties shall **CONFER** and **FILE** a **Proposed Redacted Version** of this opinion, with any competition-sensitive or otherwise protectable information blacked out.

IT IS SO ORDERED.

s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge
